166 N.J. Super. 36 (1979)
398 A.2d 1315
RINGWOOD ASSOCIATES, LTD., A NEW JERSEY LIMITED PARTNERSHIP, PLAINTIFF-APPELLANT,
v.
JACK'S OF ROUTE 23, INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 1978.
Decided February 13, 1979.
*38 Before Judges CONFORD, PRESSLER and KING.
Mr. Richard L. Zucker argued the cause for appellant (Messrs. Lasser, Lasser, Sarokin & Hochman, attorneys).
Mr. Lawrence D. Katz argued the cause for respondent (Messrs. Scangarella & Feeney, attorneys).
The opinion of the court was delivered by KING, J.A.D.
The principal issue in dispute between plaintiff landlord, owner of a neighborhood shopping center, and defendant tenant, formerly the operator of a small clothing store in the center, is whether the tenant was justified in vacating the premises before the end of the term because the landlord breached the lease by unreasonably withholding its consent to an assignment of subletting. The trial judge, in an opinion reported at 153 N.J. Super. 294 (Law Div. 1977), found that consent was unreasonably withheld by the landlord and accordingly held that the tenant was entitled to vacate the premises and to terminate the lease without liability for subsequent rent.
The facts, as clearly stated in the opinion of the trial judge, and fully supported by the record in this nonjury trial, are as follows:

*39 Defendant, which operates a men's and boy's retail clothing store, entered into a ten-year lease with the previous owner, Ringwood Plaza, Inc., the leasehold to commence on April 1, 1970. The leased premises, designated as Store No. 10, was located in a "strip"-type, neighborhood shopping center in Ringwood, New Jersey. The shopping center consisted of about 15 stores, with tenants engaged in various small business enterprises. On December 31, 1975 the present owner, Ringwood Associates, purchased the property with an assignment of all existing leases and now brings suit as a successor in interest.
With about five years remaining on the lease, defendant, having determined that the store was too small for its expanding business, decided to move to a larger location in another shopping center across the street. In January 1975 Louis Vento, secretary of defendant corporation, advised the lessor, through counsel, that defendant, pursuant to paragraph five of the lease, wished to assign the lease or sublet the premises to Comtap, Inc., which sells and repairs televisions and other appliances.
Paragraph five of the lease states:
That the tenant shall not assign this agreement, or underlet or underlease the premises, or any part thereof, or occupy, or permit or suffer the same to be occupied for any business or purpose deemed disreputable or extra hazardous on account of fire, under penalty of damages and forfeiture, without the consent of the landlord, which consent shall not be unreasonably withheld.
Having received no response from the lessor after several requests, Vento, along with Joseph Leto, president of Comtap, directly contacted Dr. Harold Linn, a substantial stockholder in the lessor corporation, concerning the assignment of the lease to Comtap. On several occasions both Vento and Leto informed Dr. Linn that Comtap was willing to take an assignment of the lease or enter into a new leasing arrangement directly with the lessor under the same terms and conditions contained in the lease with defendant. Further, Dr. Linn was advised that defendant was willing to guarantee performance of all tenant covenants contained in the lease.
Dr. Linn did not request information concerning the financial condition of Comtap, nor did he find that the proposed tenant was unacceptable to the lessor. Rather, he informed Vento that the lessor would not consent to a tripartite assignment arrangement, but would be willing to enter into an entirely new leasing agreement directly with Comtap at an increased rent. This proposal was rejected by Leto. Thereafter, Dr. Linn directly negotiated with Leto, who again rejected the lessor's consistent demand for an increased rent within the context of a direct rental by Comtap. *40 It should be noted that the original lease provided for periodic increases in rent.
Defendant, having advised the lessor, through its attorney, that it considered the withholding of consent to be unreasonable and a breach of paragraph five of the lease, vacated the premises in March 1975, the last rental being paid through April 1975. It appears that from April until December, 1975, when the shopping center was sold to plaintiff Ringwood Associates, Ringwood Plaza, Inc. made no effort to obtain a new tenant. Upon acquiring the property, plaintiff did not contact defendant. However, within 2 1/2 months a new tenant for the store was secured, although he did not commence paying rent until June 18, 1976. As a successor in interest, plaintiff is suing for rent and other miscellaneous charges for the entire period from May 1, 1975 to June 18, 1976. [Id. at 299-300]
Concluding that the tenant was entitled to terminate the lease upon the material breach of the consensual assignment clause by the corporate landlord, the trial judge dismissed plaintiff's complaint for money damages representing the rental sums due until the premises were relet in June 1976.
Plaintiff appeals, raising two claims of legal error. It asserts that the trial judge committed reversible error (1) in admitting into evidence statements made by Linn, a principal of plaintiff's corporate predecessor in title, and (2) in holding that the tenant had the legal right to terminate the lease and vacate when the landlord breached the consensual assignment clause.
We treat the evidential point first. Plaintiff objects to the admission of statements by Linn, a substantial stockholder of the landlord corporation preceding plaintiff in title. These statements were made during the discussions which followed the request by Louis Vento, defendant's secretary, for the landlord's permission to assign the lease and sublet the premises. Linn's statements were made to both Vento and to Joseph Leto, the president of the proposed assignee corporation. Both Vento and Leto testified at trial; Linn did not. Linn's alleged extrajudicial statements during the discussions about the assignment were obviously instrumental in convincing the trial judge that plaintiff's predecessor in title *41 had unreasonably withheld consent to the proposed assignment. The judge specifically found that Linn's statements to Vento and Leto evinced his firm intention to enter into a new lease with the proposed assignee at a higher rent, and that Linn disdained any reasonable consideration of the request to consent to the assignment.
The trial judge appears to have admitted Linn's hearsay statements to Leto and Vento into evidence on the theory that they were admissions made by the authorized representative of plaintiff's predecessor in title. There is no doubt that Linn, as a substantial stockholder who exclusively handled the negotiations surrounding the request for assignment, was authorized to speak for plaintiff's predecessor in the context "of a then existing agency * * * or representative relationship." Evid. R. 63(9)(a). However, statements constituting vicarious admissions under this rule are only admissible if the declarant was in an agency and/or representative relationship with the party against whom the evidence is offered. Linn's principal was not the plaintiff, but plaintiff's predecessor in title. See also, Evid. R. 63(7). Nor were Linn's statements ever authorized by plaintiff within the meaning of Evid. R. 63 (8) relating to "authorized admissions." Therefore, the admissibility of Linn's testimony, if hearsay, must be justified by some exception other than these conventional "admission" exceptions.
The New Jersey Rules of Evidence, effective September 11, 1967, never adopted the common law exception under which hearsay statements made by predecessors in interest or other declarants in privity with parties litigant have been traditionally admitted. This despite Dean Wigmore's description of this exception to the hearsay rule as one which "is today nowhere denied" (subject to only one modification not here relevant) and which his text correctly notes was firmly rooted in New Jersey evidence law before the adoption of our Rules of Evidence. 4 Wigmore, Evidence (1972), § 1080 at 192 and § 1082 at 212 fn. 1, the latter citing Townsend v. Johnson, 3 N.J.L. 279 (Sup. Ct. 1810); *42 Miller v. Feenane, 50 N.J.L. 32 (Sup. Ct. 1887), and Turner v. Cole, 116 N.J. Eq. 368 (Ch. 1934), aff'd 118 N.J. Eq. 497 (E. & A. 1935). See also, National Silk Dyeing Co. v. Grobart, 117 N.J. Eq. 156, 160 (Ch. 1934); Horner v. Stillwell, 35 N.J.L. 307, 310 (Sup. Ct. 1871).
The reason for our Supreme Court's and Legislature's rejection of the traditional "privity exception" is expressed in the Report of the Supreme Court's Committee on Evidence (1963):
It should be noted that the Rules presented here make no provision for the admissibility as vicarious admissions of statements made by joint tenants about the joint tenancy, by predecessors in interest, or by other declarants in privity with parties in litigation. This reflects a long standing campaign by Professor Morgan against what he has called the ignis fatuus of privity. See Morgan, The Rationale of Vicarious Admissions, 42 Harv. L. Rev. 461, 480 (1929). There is no guarantee of trustworthiness in a statement made by a declarant merely because he is in privity with a party to litigation. If self-serving when made it is untrustworthy; if disserving it will probably be admissible as a declaration against interest under Rule 63(10). By virtue of specific deletion from rules relating to admissions, such admissions would cease to be admissible in New Jersey unless the Supreme Court rules otherwise. [at 168]
The exclusion of the privity exception in the 1963 committee draft was carried forward into the evidence rules as finally adopted in 1967. Therefore the traditional "privity exception" was an improper vehicle for the admission of Linn's statements at trial.
We are, however, convinced that Linn's extrajudicial statements were not testimonial assertions as such, were not within the category of hearsay at all, and were properly admitted as "verbal acts." Linn's statements that he would apparently not under any circumstances consent to an assignment of the lease and his subsequent attempts to negotiate a new lease for increased rent directly with the proposed assignee constituted conduct which bore on the reasonableness of the action of plaintiff's predecessor in title in refusing the request to consent to the assignment. Linn's statement *43 was not offered to prove truthful content thereof but to show by the fact of the making of the statement that the refusal to consent was unreasonable. See discussions at 6 Wigmore, Evidence (1976), § 1772- § 1778 at 267 to 313; McCormick, Evidence, § 249 at 588 (1972). The oral statements by the parties to the lease were "not evidence of assertions offered testimonially but rather of utterances  verbal conduct  to which the law attaches duties and liabilities." Ibid. Other examples of utterances considered as evidence of conduct and not hearsay statements include Sutera v. Provident Ins. Co. of N.Y., 67 N.J. Super. 554, 563 (App. Div. 1961), certif. den. 36 N.J. 131 (1961) (statement by insured as evidence of noncooperation); Schloss v. Trounstine, 135 N.J.L. 11, 13 (Sup. Ct. 1946) (contemporary notations on check stubs, held, verbal acts indicative of drawer's intent); Kelly v. Pitney, 98 N.J.L. 773 (E. & A. 1923) (notes written on envelope containing testator's will, held, evidential of events recorded therein).
Whether Linn actually made the statements and performed the acts attributable to him was dependent on the credibility at trial of the witness-declarants, Leto and Vento. Their credibility was directly assessed, with the traditional safeguard of cross-examination, and accepted by the trial judge. We therefore find no error in the admission into evidence of Linn's extrajudicial statements and conduct, as they were binding on the original landlord's assignee and successors in interest, the plaintiff. Restatement, Contracts, § 167(1) at 211 (1932); see Brooklawn v. Brooklawn Housing Corp., 129 N.J.L. 77 (E. & A. 1942).
On the substantive issue, we agree with the conclusion reached by Judge Martin below, essentially for the reasons expressed in his written opinion, subject to modification as expressed infra. Plaintiff contends that while the doctrine of independent covenants has been eroded in this jurisdiction, it should still be the law that a commercial tenant's covenant to pay rent is independent of the landlord's covenant to act reasonably *44 in not witholding consent to a proposed assignment or subletting. It contends that the alternative remedies of a suit for damages or an action for specific performance are adequate. We disagree for the reasons expressed below at 153 N.J. Super. 310-311. Additionally, our Supreme Court has heralded, if not commanded, the demise of the doctrine of independent covenants in commercial leaseholds in Reste Realty Corp. v. Cooper, 53 N.J. 444, 461-2 (1969), a case where the lessee had abandoned office premises because of flooding conditions. The court found that the breach of the landlord's covenant of quiet enjoyment was not independent of the duty to pay rent, stating, "Thus it is apparent from our discussion that a tenant's right to vacate leased premises is the same from a doctrinal standpoint whether treated as stemming from breach of a covenant of quiet enjoyment or from breach of any other dependent covenant." Id. at 460. With specific respect to the tenant's remedy, the court stated that "it is immaterial whether the right is expressed in terms of a breach of covenant of quiet enjoyment, or material failure of consideration, or material breach of an implied warranty against latent defects." Id. at 461; see Demirci v. Burns, 124 N.J. Super. 274 (App. Div. 1973) (small commercial premises rented for professional services).
The Restatement, Property 2d, § 15.2 at 106, comment (h) (1977), also supports the conclusion reached by the trial judge. This comment states:
Provision in lease that consent to an alienation will not be withheld unreasonably. If the lease specifically provides that the landlord or the tenant will not withhold his consent to a proposed transfer by the other party unreasonably, the other party has options not available if such obligation is merely imposed by operation of law. Such specific provision in the lease is a promise and upon its breach the other party will be entitled to all the remedies available for a breach of a promise (see §§ 7.1 and 13.1), including the right to terminate the lease. When a party to the lease must rely solely on the rule of this section, he is simply free to alienate if the other party withholds consent unreasonably, but cannot obtain damages. *45 § 7.1 of the Restatement, Property 2d, captioned "Nonperformance of Landlord's Promise  Remedies Available," referred to in comment (h) supra, permits the tenant to terminate the lease if the landlord's breach of covenant deprives the tenant of "a significant inducement to the making of the lease." Comment (c) to § 7.1 states:
The dependent-promises doctrine is not on a sound basis if it is applied in situations where the landlord's failure to perform his promise has only a peripheral effect on the use of the leased property by the tenant. The performance of the promise must have a significant impact on the benefits the tenant anticipated he would receive under the lease.
The evidence was sufficient to support the trial judge's conclusion that the assignment clause was a substantial and material element of the contract to let  a significant, not peripheral, inducement, in the language of the Restatement 2d. The assignment clause in this boiler-plate commercial lease form was printed with the exception of the words "without the consent of the Landlord, which consent shall not be unreasonably withheld," which words were typed. The parties therefore deemed the assignment clause important enough to modify the printed form. Although no testimony was offered below on the intent of the parties, we think it fair to conclude that reasonable assignability of the leasehold was of importance to the tenant under this ten-year lease. Certainly it was not thought trivial and inconsequential. Moreover, paragraph 15 evinces the intent of the landlord to treat all of the tenant's covenants as dependent or material. This paragraph states, "That if default be made in any of the covenants herein contained, then it shall be lawful for the said landlord to re-enter the said premises, and the same to have again re-possess and enjoy." Our conclusion that the tenant has an equal right to terminate on breach of a material covenant is therefore not disharmonious with but rather coordinate to and mutual with the landlord's express contractual remedies.
*46 We disagree with the trial judge's contract law analysis to the extent that it relies upon an extension of the residential landlord's duty to mitigate damages to commercial landlords. See 153 N.J. Super. at 306-308. This extension of Sommer v. Kridel, 74 N.J. 446 (1977), was unnecessary. Since the trial judge correctly determined that plaintiff's predecessor in title materially breached the assignment clause, thus entitling defendant to vacate, there was no need to reach the question of damages. Adoption of the Sommer approach was perfectly appropriate in reaching the conclusion that contract rather than property law principles controlled the analysis of this case. But there was no need to cast that conclusion in terms of the rule of mitigation of damages. Indeed, the Supreme Court in Sommer v. Kridel, supra at 456, fn. 4 specifically reserved "for another day" decision on the extension of the duty to mitigate damages to commercial landlords. There is no need in this case to anticipate the ruling.
Affirmed.